UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

GWENDOLYN NICOLE BUFORD,

       **Plaintiff,**

  **v.**                                **4:10CV49**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration,**

       **Defendant.**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Gwendolyn Buford ("Buford" or "plaintiff") brought this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. This action was referred to a United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, the Court recommends that the final decision of the Commissioner be affirmed.

## I. PROCEDURAL BACKGROUND

On June 4, 2007, Buford filed an application for DIB, alleging disability beginning April 11, 2007, due to degenerative arthritis, chronic neck and back pain, and spinal fusion surgery. (R. 71, 100, 204-05). The Commissioner denied her application initially (R. 43-47), and upon

reconsideration, (R. 51-53). Buford made a timely request for an administrative hearing, (R. 54), which was conducted May 19, 2009, (R. 21-39).

On June 9, 2009, Administrative Law Judge ("ALJ") Michael J. Cummings found that plaintiff was not disabled within the meaning of the Social Security Act, and denied Buford's claim for DIB. (R. 12-19). On December 22, 2009, the Appeals Council denied review of the ALJ's decision (R. 3-7), thereby making the ALJ's decision the final decision of the Commissioner.

Pursuant to 42 U.S.C. § 405(g), on April 22, 2010, Buford filed this action seeking judicial review of the Commissioner's final decision. This case is now before the Court for disposition of the parties' cross-motions for summary judgment.

## II. FACTUAL BACKGROUND

Buford was born on May 29, 1966 and has a high school education. (R. 24, 27). Plaintiff testified that she is 5'7" or 5'8" and weighs 160 pounds. (R. 26).[1] Plaintiff was employed as a prospect researcher from 1998 to 2007. (R. 27). The job primarily involved sitting at a computer. (R. 27). In this capacity, plaintiff sat between four and eight hours per day, lifted no more than ten pounds, and frequently lifted less than ten pounds. (R. 101, 120, 161).

Plaintiff has had chronic neck and back pain since 1997. (R. 177). In September 2006, Helmuth Trieshmann Jr., M.D., first suggested that plaintiff "seriously" consider hip replacement surgery and restricted plaintiff to performing light duty work. (R. 172-73). Plaintiff later sought chiropractic treatment for her cervical, upper thoracic, and lumbar spine complaints between February and March 2007. (R. 175-82). In February 2007, x-rays of her cervical and lumbar spine

---

[1]Plaintiff testified that she used to weigh significantly more, but underwent gastric bypass surgery in 2003, in part to alleviate the pain caused by her osteoarthritis. (R. 26).

2

revealed straightening of the curvature of her cervical spine, degenerative changes at C3-C6, mild right scoliosis, and degenerative joint disease ("DJD") in her hips. (R. 178, 180).

In April 2007, Anthony Carter, M.D., examined plaintiff. Buford reported constant hip pain with some fluctuation in intensity, but denied any muscular weakness, incoordination, tingling, or numbness. Her exam revealed no tenderness, swelling, instability, weakness, or atrophy. (R. 288-89).

Also in April 2007, plaintiff was examined by Thomas Stiles, M.D. At that time, plaintiff complained of right shoulder pain that radiated down her right arm. Dr. Stiles reported plaintiff had difficulty bending her neck laterally and rotating it to the right. Plaintiff complained of tenderness in her trapezius muscle and lower cervical area, but no tenderness of her rotator cuff. There was no pain on manipulation of her shoulder. Her reflexes were hyperactive on the right. There was no evidence of muscle wasting on her right. X-rays showed degenerative arthritis with calcification, particularly at C4-C5 and C5-C6, as well as in her hips. (R. 268). Dr. Stiles ordered a MRI of plaintiff's cervical spine, prescribed pain medication, and referred her to Paul Savas, M.D., an orthopaedic specialist, for an evaluation. (R. 204, 218-19, 265, 268).

Dr. Savas examined plaintiff in late April 2007. She continued to complain of radiating pain in her right shoulder and arm. Dr. Savas noted no impingement of the muscle above the spine on plaintiff's shoulder. Her extremities were not weak, her reflexes were preserved, and her sensation was intact to light touch. (R. 204). The MRI of her cervical spine revealed multi-level disc protrusions with narrowing greatest at C5-C6 and C6-C7 on the right. (R. 204, 218-19). Dr. Savas discussed treatment options with plaintiff and she expressed an interest in surgery in order to relieve

3

her symptoms before she underwent hip surgery. (R. 204). On May 9, 2007, Dr. Savas performed a C5-6, C6-7 spinal fusion (R. 202-03), and prescribed a bone growth stimulator. (R. 199).

At her first post-operative visit, plaintiff complained of pain in her neck and right arm, which Dr. Savas thought might be an aggravation or flare-up of her symptoms. Dr. Savas noted that the incision was healing properly and that there was no weakness in her extremities. Dr. Savas adjusted plaintiff's medication regimen. (R. 201). In June 2007, Dr. Savas reported plaintiff was making steady progress and her pre-operative radiculopathy had improved. Dr. Savas noted plaintiff had some mechanical neck pain radiating to her mid-shoulder blade region, but it was not her pre-operative radiculopathy. Dr. Savas noted no weakness or motor deficit in her upper extremities and instructed plaintiff to remain active. (R. 200).

In July 2007, John Aldridge, M.D., performed an orthopaedic examination of plaintiff. (R. 286-87). Buford complained of constant, non-radiating neck pain aggravated by bending, straining, and head turning. Dr. Aldridge noted that her mood was normal and her affect was appropriate. (R. 286). Her coordination, sensation, and reflexes were intact. (R. 286-87). She complained of mild muscle tenderness and had paraspinal muscle spasm in her neck. Dr. Aldridge's notes reflect no evidence of instability of her cervical spine (R. 286); no tenderness, swelling, or crepitus; and plaintiff had full and painless range of motion ("ROM") of her shoulders. There was no shoulder joint instability. Her strength was 5/5 and her reflexes were 2+ in her biceps and triceps. (R. 286-87). There was no indication of instability of her thoracic spine but she complained of tenderness and pain on ROM and she had paraspinal muscle spasm. Her gait and station were normal. Dr. Aldridge reported that plaintiff's x-rays revealed no soft tissue abnormalities, normal alignment and

4

bone density, and no bony lesions of her cervical and thoracic spines. There were degenerative disc changes in her cervical spine and disc space narrowing in her thoracic spine. Dr. Aldridge recommended physical therapy. (R. 287).

Physical therapist William Powers, III, saw plaintiff on July 12, 2007 in order to educate her on proper posture and home exercise and establish goals for physical therapy. (R. 284-85). Buford began physical therapy and Powers' notes indicate improved ROM and strength, as well as "slow progress toward goals." (R. 281-83). Also in July 2007, Dr. Savas performed a post-surgical follow-up evaluation of plaintiff. Dr. Savas reported that plaintiff was making "good" progress and her symptoms were improving. Her incision had healed nicely, her neck was soft and supple, and she had no weakness of her extremities and no motor deficit in her gait. Dr. Savas told plaintiff to continue using the bone growth stimulator and return on an as-needed basis. (R. 199). In August 2007, plaintiff's physical therapy was placed "on hold" and a TENS unit was ordered for her. (R. 281).

On September 10, 2007, Dr. Carter performed hip replacement surgery on plaintiff's left hip. (R. 215-17). Plaintiff's post-operative x-ray revealed her prosthesis was in place. (R. 276). Dr. Carter ordered that plaintiff remain out of work while she recovered. (R. 350). In late September, Buford saw Dr. Carter for a post-operative evaluation. At that time, plaintiff was full weight bearing and in no acute distress. The ROM of her left hip was within anticipated limitations, and she had no crepitation or joint instability. Her left hip and femur x-rays revealed no soft tissue abnormalities, a normal alignment, normal bone density, and no bony lesions. (R. 272).

In October 2007, Leopold Moreno, M.D., a physician consultant, reviewed plaintiff's file and completed a Physical Residual Functional Capacity Assessment. (R. 221-27). Dr. Moreno stated Buford was capable of performing sedentary work the following limitations: she could lift and/or carry ten pounds occasionally; sit and stand and/or walk about six hours each in an eight-hour workday; perform no climbing but could perform other postural activities (i.e., balancing, stooping, kneeling, crouching, and crawling) occasionally. (R. 222-23). She also had to avoid concentrated exposure to pulmonary irritants. (R. 224).

In November 2007, Buford followed-up again with her hip surgeon, Dr. Carter. Plaintiff complained of intermittent sharp, stabbing pain in both hips and stiffness in the mornings. However, she walked without using an assistive device, had no appreciable limp, and good ROM. X-rays revealed that her prosthesis was well-fixed and in good position, with no evidence of loosening. Dr. Carter concluded plaintiff's pain was mostly soft tissue in nature and related to her hip flexor. He ordered four to six weeks of physical therapy for plaintiff's left hip. (R. 271).

Plaintiff returned to Dr. Carter in December 2007. At that time, she reported that she was doing "okay," with intermittent discomfort. She had good ROM, her straight-leg raising was negative, and she was neurovascularly intact. Dr. Carter told plaintiff to continue with her activities as tolerated and to return on an as-needed basis. (R. 270).

In January 2008, Carolina Longa, M.D., a physician consultant, reviewed plaintiff's records and completed a Physical Residual Functional Capacity Assessment. (R. 253-59). Dr. Longa opined Buford was capable of performing light work which required her to lift and/or carry no more than twenty pounds occasionally and ten pounds frequently; sit and stand and/or walk about six hours

each in an eight-hour workday; with no climbing, but allowing for other postural activities occasionally. (R. 255). She had to avoid concentrated exposure to hazards (e.g., machinery and heights). (R. 256). Dr. Longa noted plaintiff had shown good improvement in her symptoms, that she did not require on-going emergency intervention, and that she only needed to see her orthopaedic surgeon on an as-needed basis. (R. 258-59).

In February 2008, plaintiff returned to Dr. Stiles complaining of pain in the low cervical, mid-dorsal, and low back areas. She had difficulty turning and moving her cervical spine and low back. She had tenderness in her trapezius, lumbar spine, and dorsal area. Straight leg-raising was not particularly painful. Hip manipulation was painful due to arthritis. Her reflexes were equal and active at the ankles. X-rays of her dorsal and lumbar spine showed osteoporotic changes and mild arthritis, but there was no evidence of fracture, dislocation, or destructive lesions. (R. 261).

Also in February 2008, plaintiff visited Natalie Barron, M.D., a family practitioner, to establish treatment. Plaintiff complained of hip, knee, and back pain, as well as migraines.[2] She reported taking Percocet occasionally when the pain from her headaches was severe. (R. 308). After she examined plaintiff, Dr. Barron adjusted plaintiff's medication and ordered x-rays. (R. 309). The x-rays of plaintiff's knees revealed mild osteoarthritis. (R. 301, 306). The alignment was normal and there was no joint effusion. (R. 306). Her lumbar spine x-ray revealed minimal scoliosis and minimal facet arthritis. (R. 304).

In March 2008, plaintiff returned for a one-month follow-up with Dr. Barron. Plaintiff was in no acute distress, her neurologic exam was non-focal, and she walked with a cane. (R. 300). Dr.

---

[2]Plaintiff has a history of migraine headaches, stemming from when she was ten or twelve years old. (R. 291-92).

Barron referred plaintiff to Dr. Carter for consideration of possible hip surgery. (R. 300). When Buford saw Dr. Carter later in March 2008, plaintiff said her hip was okay. Instead, she complained of neck and back pain. Plaintiff had stiffness and some discomfort in her spinal area; she complained of tenderness in her upper and lower spine, but she exhibited no focal motor weakness and no sensory deficits. Her deep tendon reflexes were normal and symmetric in her upper and lower extremities. X-rays of her cervical and lumbar spine revealed no fractures or dislocation and her overall alignment was good. Dr. Carter told plaintiff to continue with activities as tolerated, do warm soaks and stretching exercises, and return on an as-needed basis. (R. 269).

In October 2008, Dr. Carlson performed an orthopaedic evaluation of plaintiff, who complained on that day of neck pain that radiated into her shoulders and chest. (R. 319-20). Plaintiff appeared comfortable and healthy. Her cervical spine was not tender to palpation and there was no spasm of her paracervical muscle. There was no tenderness on palpation of her trapezius muscle, ROM of her cervical spine was normal, and there was no muscle atrophy of her shoulders. Although she complained of tenderness in the subacromial space, there was no tenderness on palpation of her glenohumeral joint region. (R. 319). No pain was elicited on impingement testing and there was no instability in her shoulders; rather, she had good ROM of her shoulders. (R. 319-20). Her neurologic exam was intact, she had normal motor strength, and her gait and stance were normal. An MRI revealed a protruding disc at C7-T1 and mild degenerative disc disease ("DDD") at C3-C4 and C4-C5. (R. 320). Dr. Carlson thought plaintiff had a right shoulder impingement. Because of this, as well as her surgical history and worsening pain, Dr. Carlson ordered an EMG/nerve conduction study ("NCS") and a corticosteroid injection. (R. 320). The EMG/NCS

8

revealed no evidence of a neuromuscular disease. (R. 318).

Plaintiff returned to see Dr. Carlson in November 2008 and, at that time, appeared comfortable and healthy. Plaintiff indicated that her right shoulder was still giving her problems, and her exam was essentially unchanged from October. Dr. Carlson ordered hip x-rays, which revealed osteoarthritis of her right hip. (R. 314, 316). Dr. Carlson sent plaintiff for an MRI of her shoulder, which revealed a rotator cuff tear. (R. 315-16). It was not a full thickness cuff tear, there was no tendon retraction or muscle atrophy, and she had only mild acromioclavicular joint hypertrophy. (R. 315). Dr. Carlson also sent plaintiff for a bone scan, which showed essentially no evidence of an inflammatory process or loosening, but there was osteoarthritis in her right hip. (R. 311-14, 363).

Also during the November 2008 visit, Dr. Carlson completed a questionnaire for plaintiff's disability insurance provider. (R. 354-56). He reported plaintiff had degenerative joint disease in her hip, a rotator cuff tear, and hand pain. (R. 354). Dr. Carlson said plaintiff's condition restricted her to sedentary work that involved lifting and carrying up to ten pounds; walking/standing occasionally; and sitting six to eight hours. (R. 355).

Dr. Carlson referred plaintiff to Robert Snyder, M.D., for evaluation and to discuss surgical intervention. (R. 310, 314). In early December 2008, Dr. Snyder discussed with plaintiff surgery for shoulder arthroscopy, acromioplasty, distal clavicle excision, and a SLAP lesion repair. Dr. Snyder informed plaintiff that she would be immobilized for four weeks after surgery. (R. 310).

Plaintiff was examined by Dr. Carlson again in February 2009, at which time they discussed treatment options and Dr. Carlson instructed plaintiff to follow-up with Dr. Snyder. Plaintiff's physical exam at the time revealed tenderness of the left hip but full ROM without pain, full ROM of

the knees and ankles, no weakness in the hips and lower extremities, and an intact neurologic exam. Dr. Carlson noted that plaintiff had "significant" osteoarthritis in her right hip, and that the MRI of her right shoulder revealed a labral tear. (R. 363).

Buford followed up with Dr. Snyder but decided not to undergo surgery on her shoulder. EMG studies and a MRI on plaintiff's lower back were ordered. (R. 362). The MRI revealed a mild diffuse bulging disc at L4-L5 with left facet joint arthrosis resulting in neural foraminal narrowing. (R. 364, 367). The EMG/NCS, as with the one conducted in November 2008, was normal and revealed no evidence of a neuromuscular disease. (R. 365-66). Plaintiff was referred for an L3 epidural steroid injection. (R. 367, 369).

On April 3, 2009, Dr. Carlson completed another insurance questionnaire for plaintiff. (R. 358-59). Dr. Carlson felt plaintiff could possibly return to part-time sedentary work. (R. 358). On the same date, Dr. Carlson completed an Estimated Functional Abilities Form for the carrier in which he indicated that plaintiff had the current functional ability for sedentary activity, meaning that she could occasionally stand and walk; sit six to eight hours; occasionally lift up to twenty pounds; frequently push and pull up to ten pounds; frequently reach above her shoulder level; occasionally bend and climb stairs, but never kneel and crawl. (R. 360-61).

On April 30, 2009, Dr. Stiles evaluated Buford on her request for a second opinion concerning her disability rating. (R. 372-73). Plaintiff reported that she was in constant pain and unable to be comfortable for more than a few minutes at a time. Plaintiff also indicated that she was on constant pain medication. Dr. Stiles noted that it was difficult to examine plaintiff because of her complaints of pain on movement. To the extent that he was able to examine plaintiff, Dr. Stiles

10

reported "rather marked restriction of flexion and extension," with some radiating pain. (R. 372). Examination of plaintiff's low back was difficult due to her problems with her hips. Dr. Stiles noted that plaintiff had muscle spasms and difficulty getting up and down as a result of the spasms and pain. Plaintiff experienced pain in her left hip with any type of motion, tenderness and slight swelling of her left thigh. (R. 372). Dr. Stiles could not examine plaintiff's left knee due to pain. Examination of the right hip revealed considerable crepitation and pain with motion, particularly with rotary motion, and the right knee could not be examined due to pain. Dr. Stiles noted that plaintiff had good ROM of her hands, writs, feet, and ankles. Dr. Stiles believed that plaintiff was "completely disabled" from any type of gainful employment. (R. 373).

Dr. Stiles also completed a Claim for Income Protection Benefits questionnaire for Buford's insurer. (R. 370-71). Dr. Stiles checked-off boxes indicating that plaintiff could not work a full eight-hour workday; could sit intermittently; stand for two hours; walk for one hour; lift up to ten pounds occasionally; and do push/pull activities occasionally on her left but never on her right. (R. 371).

At the hearing, Buford testified that she is disabled and unable to work because of degenerative arthritis and chronic pain that restricts her to sit and stand in ten-minute intervals. (R. 24-25). Plaintiff also stated that she suffers from migraines at least once per week. (R. 30). She testified that she takes the following medications: Percocet, Lyrica, hydromorphone, Ambien, and Butalbital. (R. 25). Plaintiff also stated that she manages her pain by using a TENS Unit approximately four hours per day. (R. 29). Plaintiff testified that the pain has caused her to become depressed. (R. 31).

11

Buford lives with her husband and three children. (R. 26). She reported that her sister-in-law comes over several times per week to help her bathe, as well as plan and prepare meals. (R. 35-36). Plaintiff testified that she is only able to lift items as heavy as a gallon of milk and has limited hand strength. Plaintiff testified that she was prescribed a cane in 2007 and continues to use it when required to walk more than a few steps. She stated that she cannot stand or sit upright for more than four or five minutes at a time, and that she is most comfortable lying down with several pillows she strategically places around her body. (R. 33-34). Plaintiff testified that she spends five to six hours per day reclined or lying down. (R. 35).

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether such decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2008); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting

evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.   ANALYSIS

To qualify for a period of disability and DIB under sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for DIB and a period of disability, and be under a "disability" as defined in the Act. The Social Security Regulations define "disability" as the:

> inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.[3]  20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

---

[3]The Administration may satisfy its burden by showing that considering the plaintiff's RFC, age, education and work experience, he is either disabled or not disabled based on medical-vocational guidelines, or "grids," published at 20 C.F.R., Pt. 404, Subpt. P, App. 2.  However, technical application of the grids is not always appropriate, and thus the Commissioner must rely on the testimony of a VE to determine whether an individual claimant is in fact capable of

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Sbpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. § 404.1520. The burden of proof and production rests on the plaintiff during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain

performing substantial gainful activity available in significant numbers in the economy. 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 466 (1983); SSR 83-10, 1983 WL 31251 (S.S.A.).

and disability, and the claimant's educational background, age, and work experience." <u>Schnetzler v. Astrue</u>, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. <u>Hays</u>, 907 F.2d at 1456.

## A.     The ALJ's Decision

In Buford's case, the ALJ made the following findings under the five-part analysis: (1) plaintiff has not engaged in substantial gainful activity since April 11, 2007 (the alleged onset date of disability); (2) plaintiff has severe impairments of degenerative disc disease and osteoarthritis[4]; (3) plaintiff's impairments (or combination of impairments) do not meet one of the listed impairments in Appendix 1; and (4) plaintiff has the RFC to perform sedentary work and is capable of performing her past relevant work as a prospect researcher. (R. 14-19).

Buford now argues that the ALJ erred in determining her RFC. Specifically, she claims that the ALJ: (1) failed to give proper weight to the opinion of one of her treating physicians, Dr. Stiles; (2) assigned improper weight to the opinions of the non-examining State Agency physicians; and (3) did not support with substantial evidence his finding that Buford's testimony was only "partially credible." The Court considers each argument in turn.

## B.     The ALJ properly evaluated the evidence bearing on Buford's RFC.

Buford contends that the ALJ erred in determining her RFC, which is defined as the plaintiff's maximum ability to work despite her impairments. 20 C.F.R. § 404.1545(a)(1); <u>see</u> SSR

---

[4]As to Buford's other impairments, the ALJ found that Buford's right shoulder rotator cuff tear was not severe "because it did not exist for a continuous period of at least 12 months, and does not result in any continuous exertional or nonexertional functional limitations." (R. 14). Applying the regulations that set forth how to evaluate mental disorders, the ALJ determined that Buford's depression was not severe because it "does not cause more than minimal limitation in [Buford's] ability to perform basic mental work activities." (R. 14-15). Buford did not challenge either of these findings in her summary judgment motion.

96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). When a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must then determine the plaintiff's RFC. 20 C.F.R. § 404.1520(e). After doing so, the ALJ uses that RFC at step four of the sequential analysis to determine whether the plaintiff can perform his past relevant work. Id. at § 404.1545(a)(5)(i). If it is determined that the plaintiff cannot perform past relevant work, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy. Id. at § 404.1545(a)(5)(ii).

At the administrative hearing level, the ALJ alone has the responsibility of determining RFC. Id. at § 1546(c). RFC is determined by considering all the relevant medical and other evidence[5] in the record. Id. at §§ 404.1545(a)(3) and 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements'—i.e., opinions about what the individual can still do despite his or her impairments(s)—submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.). In this case, the ALJ found that Buford has the RFC to perform sedentary work involving standing and walking for a total of two hours, and sitting for six hours in an eight-hour workday. (R. 15).

1.      **The ALJ properly explained the weight assigned to medial opinions.**

Buford first contends that the ALJ erred by assigning "little weight" to the opinion of Dr. Thomas Stiles, one of plaintiff's treating physicians. According to Buford, "Dr. Stiles['] opinion

---

[5]"Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

about [plaintiff's] capacity to work is supported by substantial evidence and should have been afforded the greatest weight." (Doc. #15 at 26). Buford further contends that the ALJ assigned improper weight to the opinions of Dr. Moreno and Dr. Longa, physicians employed by the state agency to evaluate Buford's claims.

As stated previously, the ALJ alone has the responsibility of determining RFC. In doing so, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527.

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. at § 404.1527(d)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at § 404.1527(d)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations.]" SSR 96-2P,

17

1996 WL 374188, at *5 (S.S.A.). When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. Id. at § 404.1527(d)(2).[6]

In his decision, the ALJ found, after "careful consideration of the entire record," that plaintiff is capable of performing sedentary work. (R. 15). In making the RFC determination, the ALJ provided a lengthy review of plaintiff's treatment record including the records of treating physicians Dr. Trieshmann, Dr. Parham, and Dr. Barron, and treating orthopaedists Dr. Carter, Dr. Carlson, and Dr. Stiles. (R. 17-18). Two of plaintiff's treating orthopaedists—Dr. Carlson and Dr. Stiles—completed contemporaneous assessments of plaintiff's physical abilities in the Spring of 2009. In his decision, the ALJ discussed these assessments at length. The ALJ accorded "significant weight" to the assessment by Dr. Carlson who opined that plaintiff could possibly return to part-time sedentary work. Dr. Carlson indicated that plaintiff could occasionally stand and walk; sit six to eight hours; occasionally lift up to twenty pounds; frequently push and pull up to ten pounds; frequently reach above her shoulder level; occasionally bend and climb stairs, but never kneel and crawl. (R. 17, 19). The ALJ determined that the evidence of record was consistent with Dr. Carlson's opinion that plaintiff could return to sedentary work.

The ALJ accorded "little weight" to Dr. Stiles' assessment that plaintiff "is completely disabled from any type of gainful employment." (R. 19, 373).[7] In so doing, the ALJ noted that Dr.

---

[6] In fact, under the applicable regulations, the ALJ is required to "explain" in his decision the weight accorded to all opinions—treating sources, nontreating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(f)(2)(ii).

[7] Dr. Stiles notes that he was assessing plaintiff's functional capacity because plaintiff requested a "second opinion." (R. 372).

18

Stiles' examination of plaintiff was "brief and restricted" and that "many tests were not performed because of alleged severe pain on movement." (R. 17-18). The ALJ determined that Dr. Stiles' opinion that plaintiff's limitations precluded all work activity was not supported by the record. (R. 19).

In her motion for summary judgment, Buford essentially asks the Court to overturn the decision of the ALJ and assign more weight to the opinion of Dr. Stiles, the treating physician whose evaluation was more favorable to her claim for DIB, as opposed to Dr. Carlson, the treating physician who concluded she was capable of sedentary work. Having reviewed the ALJ's report and the reasons articulated in that report, the Court finds that the ALJ supplied "good reasons" for not giving "controlling weight" to Dr. Stiles' opinion. Both Dr. Stiles and Dr. Carlson examined Buford in the same month, April, 2009. Dr. Carlson was able to complete his examination, and report more detailed observations, where Dr. Stiles' exam was limited by Buford's complaints of pain. The ALJ concluded Dr. Carlson's findings were more consistent with the other evidence in the record, including the observations of Dr. Barron, another treating provider. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or on the Commissioner's designate, the ALJ)." Craig, 76 F.3d at 589. Dr. Stiles' opinion that plaintiff is totally disabled is contradicted in the record by the opinion of another treating physician and other medical evidence of record. The ALJ did not err by refusing to give his opinion controlling weight. Jones v. Sullivan, 954 F.2d 125, 128-29 (3d Cir. 1991).

In addition to Dr. Carlson's opinion, the ALJ also relied upon the RFC assessments performed by consulting physicians Dr. Moreno and Dr. Longa—each of whom found that plaintiff had the RFC to perform work. (R. 17). The ALJ states that he considered these opinions and accorded them significant weight. However, the ALJ states that he gave "greater weight to the opinion of treating orthopedic surgeon, Dr. Carlson," and found "that [Buford] is more limited than assessed by Dr. Longa." (R. 19).

Plaintiff contends that the ALJ assigned improper weight to the opinions of Dr. Moreno and Longa, but provides little argument on this point beyond her claim that the opinions of non-examining physicians cannot "trump" the opinion of a treating physician (Dr. Stiles).

Put simply, plaintiff is incorrect. A claimant's RFC is determined by considering all the relevant medical and other evidence in the record and the weight assigned to an opinion is in part determined by how consistent it is with the medical record. The opinion of a non-examining, non-treating physician can be relied upon when that opinion is consistent with the record. Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). In Buford's case, the ALJ carefully considered the entire record and found the opinions of Dr. Moreno and Dr. Longa to be more consistent with the record—including the assessment of Dr. Carlson—than the opinion of Dr. Stiles. To the extent the opinions were inconsistent with the record (i.e., the more restrictive limitations found by Dr. Longa), the ALJ gave greater weight to the opinion of Dr. Carlson – Buford's treating physician. Upon review of the record and the ALJ's report, the Court finds that the ALJ sufficiently explained how he determined the weight assigned to the opinions of Dr. Moreno and Dr. Longa, and did not err in relying on them.

20

## 2.  The ALJ correctly evaluated plaintiff's complaints of pain.

Plaintiff next argues that the ALJ did not properly support his finding that plaintiff's subjective complaints of pain and limitations were only "partially credible." In step four of the analysis, the ALJ determined that "[a]fter considering the evidence of record, the undersigned finds that [Buford's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Buford's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual capacity assessment." (R. 17). The ALJ specifically found that the treatment records do not reflect the degree of limitations alleged by Buford. (R. 19).

In deciding whether a plaintiff is disabled, the ALJ must consider all symptoms, including pain, and the extent to which such symptoms can reasonably be accepted as consistent with the objective evidence. 20 C.F.R. § 404.1529(a). A plaintiff's subjective statements about pain or other symptoms alone are not enough to establish disability. Id. Under both federal regulations and Fourth Circuit precedent, determining whether a person is disabled by pain or other symptoms is a two-step process. First, the plaintiff must satisfy a threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the symptoms claimed. 20 C.F.R. § 404.1529(b); Craig, 76 F.3d at 594 and 595. "However, while a claimant must show by objective evidence the existence of an underlying impairment that could cause the pain alleged, 'there need not be objective evidence of the pain itself.'" Craig, 76 F.3d at 592-93 (quoting Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir. 1986)).

After the plaintiff has satisfied the first step, the ALJ must evaluate the intensity and persistence of the plaintiff's symptoms and the extent to which they affect his ability to work. 20 C.F.R. § 404.1529(c)(1). In making this evaluation, the ALJ must consider "all the available evidence," including: (1) the plaintiff's history, including his own statements, id.; (2) objective medical evidence, which is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption," id. at § 404.1529(c)(2); and (3) other evidence submitted by the plaintiff relevant to the severity of the impairment such as evidence of daily activities, medical treatments and medications, and descriptions of the pain or other symptoms, id. at § 404.1529(c)(3). In evaluating the intensity and persistence of the plaintiff's symptoms and the extent to which they affect his ability to work, the ALJ must consider whether inconsistencies exist and the extent to which there is conflict between the plaintiff's statements and the other evidence. Id. at § 404.1529(c)(4). According to the regulations, a plaintiff's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the medical evidence and other evidence." Id.

Although Buford satisfied her threshold burden under the two-step inquiry set forth in the regulations and adopted by the Fourth Circuit, the ALJ found that Buford's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible" inasmuch as they are inconsistent with the record, (R. 17), and determined her testimony "partially credible as the evidence of record indicates significant improvement of her symptoms," (R. 19). In so finding, the

22

ALJ considered the entire record and documented his review in detail in the opinion. The Court finds that the ALJ complied with both the regulations and Fourth Circuit precedent in evaluating Buford's pain, and supported his decision with substantial evidence.

To the extent Buford contends that the ALJ erred in evaluating her credibility, the Court must give great deference to the ALJ's credibility determinations. Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997). "When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" Id. (quoting NLRB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)). The Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" Id. (quoting NLRB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)). Here, the ALJ performed the required analysis and articulated a number of reasons for not fully crediting plaintiff's statements. There are no exceptional circumstances which would warrant disregarding the ALJ's credibility determination. Accordingly, the Court finds the ALJ properly evaluated Buford's credibility.

## V. RECOMMENDATION

For the foregoing reasons, the Court recommends that the final decision of the Commissioner be affirmed.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia
February 1, 2011

## Clerk's Mailing Certificate

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:   *(via ECF)*

Barbara Jean Evans-Yosief
Evans-Yosief Law Firm
1517 Hardy Cash Dr.
Hampton, VA 23666

Anita Henry
U.S. Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, VA 23510

Fernando Galindo, Clerk

By _____
Deputy Clerk

_____ Feb. 2 _____, 2011